To the students, the faculty, the administration, Mr. Fagan, co-counsel, to the Honorable Court. I'm Mark Vermullin. I represent the National Lawyers Guild. Today I represent San Francisco Liberation Radio, its DJs and commentators, and members of the public that have listened to it for a number of years and enjoyed its resource. San Francisco Liberation Radio itself is a group of folks that have been broadcasting low-power FM broadcasts in San Francisco involving local news, local information, local politics for ten years. They interfered with no one. They interfered with no other station in their broadcasts. They provided vital local information, public commentary, political commentary, to the point that they were recognized very formally and very forcefully by the San Francisco Board of Supervisors and by then-Mayor Willie Brown in a resolution that supported their work, supported their being there. Gavin Newsom at the time was a supervisor. He said, even though I don't agree with a lot of what they say, I'm glad that they're there to say it. That resolution also directed the local law enforcement not to cooperate with any effort to shut down the station. San Francisco Liberation Radio and its attorneys, through this ten-year period of time, had regular communication with the FCC. They applied for licenses. They appealed the applications for licenses. They had regular communication with the agents over a long period of time. They continued to broadcast until they were shut down by a raid of the FCC agents and marshals through a raid on a home in 2003. How did that happen? The process is what's at issue here. The process that was undertaken by the FCC and the marshals to shut them down was this. The U.S. attorney filed a complaint with the district court. The district court clerk was directed, required, by Supplemental Rule C-3A to issue a warrant for the arrest of the property. With that warrant in hand, the U.S. attorney went to a district court judge and under a completely separate rule, 18 U.S.C. 983, requested and obtained a writ of entry to go into the property to seize the equipment pursuant to the warrant. Both of those procedures were ex parte, under seal, without any notice whatsoever to San Francisco Liberation Radio or to its attorneys. What difference would that have made? I mean, in the end, San Francisco Liberation Radio didn't have a license and the FCC was empowered to shut them down and the statute provides for seizure of the equipment. Whether you get notice or not, if you'd had notice, what would there have been to say? The question isn't so much what would there have been to say, but who gets to say? I think it is. Because in the end, if at the end of that notice and hearing which you say you're entitled to, the result is exactly the same. And the only practical difference is that if you get notice, you've got a chance to move the equipment someplace else, which is exactly why the statute provides for letting them go forward without notice. The statute allows them to go forward without notice, but that's only the potential movement of the equipment is only one consideration in the evaluation of whether the statute and whether the procedure used complies with due process. I don't disagree with you as to what the statute says. I hear your due process argument, but I don't think it leads anyplace. Because after the process you contend you're entitled to is finished, you've got exactly the same result. The government is entitled to seize the equipment. The problem is that at that point, the Court would have said it. At the point at which we enter and at the point at which the equipment is seized, the FCC agent gets to say it and gets to say it without any input from anyone else, gets to say it he alone or she alone. In this case, it was he alone. And that's the crux of the matter. Who gets to say it? Now, let me give you another analogy. Suppose somebody is arrested without probable cause. Does that person have a lifetime pass against conviction for whatever offense he's arrested for? And the answer, I think, is no. If you're arrested without probable cause, you may be able to contest the arrest. You may be able to suppress evidence that was seized in conjunction with the arrest. You don't get a pass from the conviction for the criminal offense. So to here, ultimately, there's really nothing to do about the due process argument at this point, because after the process is received, they've still got the right to seize the equipment. Today, all we have is seized equipment, and there's really nothing to do at this point, is there? There is at this point, because the analysis that has to be undertaken is key. The analysis is what due process is all about. I know that you know that. But the analysis that has to be undertaken here involves, in our instance, instrumentalities of expression, which is different, for example, than somebody being stopped on the street, which is different, for example, than somebody being stopped in an airport. What remedy do you seek from this action? What we seek from this action is suppression. What we seek in this action is remedies that have been specified by the courts and aren't contested, aren't even addressed by the government in our case. And that is suppression of the information of the instrumentalities, an evaluation of the harm, the monetary harm that was done from the seizure by the government without due process. And then Eldorado County, a decision by this circuit, states that an additional remedy is the dismissal of the action with leave to amend if the time has not run under the statute of limitations. Now, of course, there is a slight question in the Ninth Circuit as to whether Eldorado County is the one that governs or whether the other case didn't specify what that third remedy was. But all the authority specifies suppression and evaluation of damages. A key, a linchpin, is that there are instrumentalities of expression that are involved here. And that argument has not been raised in other First Amendment or in other forfeiture contexts before. That's why our case is different than many other cases and, quite frankly, than many of the cases that we cited and that Mr. Fagan and his office cited as well. In the end, do you have any right to the airwaves? Does SFLR have any right to the airwaves? Mm-hmm. The two Supreme Court cases that talk about rights to the airwaves or rights of listeners, rights of broadcasters, the two key cases to which I think you're referring are NBC, the 1943 case, and Red Line, the 1969 case. And I reread those cases coming into this argument because it's interesting to me. When you read the analysis of those cases, it really, quite frankly, it can go either way. There is a statement in there that there is no right to broadcast. Broadcasters do not have the right to broadcast. That is granted by the FCC. But if you look at the language and if you look at the discussion, particularly in Red Line, the language is broader and the principles are broader. Particularly in Red Line, the emphasis is on the public interest and the rights of listeners. And they do speak in Red Line extensively of the rights of the listening public because that's really what the FCC is to be enforcing and to be acting upon is the rights of listeners. But isn't it those rights that are going to be trampled if there's a free-for-all of use of the airwaves? Isn't that what Red Line concluded? Yes. And if that were to occur, if that were to occur, there would be a big problem. But we're not talking about that here. That would go into the Matthews analysis, the due process analysis. And we haven't gotten to that yet. But I will in a moment. But Congress did enact laws to allow microwave radios. It just doesn't, because of the anti-grandfather provision, it just doesn't include your client. That's one problem. And we would have been able to raise that if they would have used a different procedure to get us into court. But you're right. That would preclude SFLR. But to get back to your question about the pandemonium or the crowding that would happen, technologically, that's not going to happen. When Red Line in 69 was talking about that and when NBC in 1943 was talking about that danger, it was a very different technological world than it is today. And, in fact, the Red Line court discussed that very specifically. They didn't discuss the difference, but they discussed the technology at the time and the dangers and the problems that arose because of the technology limitations at the time. Those limitations aren't present anymore. Well, they're still present. They just don't pose the same challenge. You find a very different regime governing printed media. You find a very different regime governing webcasting. Cable is sort of in a gray zone because of technology changes. But broadcasting is still one that's inherently limited. Now, because of the technological developments, it's not limited in the same way that it used to be. You can place more stations on the spectrum. But it is still limited. If you had a much larger number of contestants, people that wanted to broadcast, you'd still need someone. You'd need the traffic cop to keep straight who gets to be on what frequency. And, as a result, the FCC has that power to be traffic cop. And the traffic cop isn't limited to exerting its powers when there's an actual conflict. The system is set up for licensing, for advanced approval. The problem here is that your client really anticipated the developments, anticipated the change in licensing, anticipated the low-power development, and Congress changed things to make it difficult for people who were the pioneers. But the statute is there. The statute calls for licensing, unlike in press or webcasting. Doesn't that make this just fundamentally different in terms of how the First Amendment does or does not apply? Respectfully, no, it doesn't. And the reason is that that is one of the things. It's not the absolute and it's not the be-all and end-all of the argument. It's one of the things that the Court is to consider in the Matthews analysis about whether pre-seizure, not forfeiture at the end, not the analysis that happens within the Court, but whether pre-seizure ex parte without notice proceedings to seize equipment is appropriate under due process, even though it's specified in this way, even though the FCC has the authority to say we allocate the bandwidth to these entities and we're going to allocate sufficient bandwidth, more than the MITRE study that was submitted to Congress said was necessary, but we're going to allocate it. I'm not contesting that the FCC has that authority and has that power. What I'm contesting is how they – whether how they exercise it now complies with due process. And if we look at Matthews, that factor comes into Matthews, but it's not, again, the be-all and end-all. The three factors, of course, under Matthews are the public and private interests at stake, the risk of erroneous deprivation, and the government's interest in acting in the pre-seizure context without notice. And the – where the FCC's interest comes in is in – or the FCC interest that you have is in the government's interest, government's interest about protecting bandwidth. But there's a lot of other interest at stake there. There's the public's interest in getting information, particularly when there's no interference, when there's no harm being done to any other broadcaster, to any other station, to any listener. Quite frankly, they're being fed with information. There are a lot of other public interests that come into play. Well, who's to make that weighing? Clarify for me, because you're – you are to make the weighing of the factors under Matthews. It seems to me that ultimately all of those arguments are sort of second-tier arguments, because it's the FCC, not the court, that's the traffic cop. And to say to the court that we, a judge, do process, well, that's true, but I really wind up coming back to the question that I started with. I'm not sure that this is anything other than empty exercise. If, in fact, the statutes empower the FCC to decide who can broadcast and who can't, it's not our decision. There is administrative law oversight of the FCC, but that's not the issue that's put before us today. And so I'm really not sure what it is the court's supposed to really adjudicate. In the end, the court is the one that makes the decision. That's the crux. That is the key. And thanks for emphasizing it, because here the FCC says so and then it's done. And for, certainly for that period between seizure and whenever there's a hearing, what the FCC says, it's done. But that's exactly the question that is ultimately to be decided, even under the current regimen, even under the current statutory scheme, by a court, not by an FCC agent. Well, we decide with regard to the seizure, but not with regard to the license. I mean, you can challenge FCC license procedures, but that's not what's in front of us today. Agreed. You're not complaining that the FCC improperly denied you a license in this particular lawsuit. Agreed. And so I'm still kind of trying to figure out what exactly is it really for the court to weigh with regard to seizure. I mean, what's the issue? What the court has to weigh is the public interest, the private interests. The FCC's interest in acting What is the public interest? What is the kind of anti-seizure interest if, in fact, you don't have a license to broadcast, so you can't broadcast? And if that's the case, the purported public interest in being able to hear your signal is irrelevant, because seizure doesn't speak to whether or not you can broadcast. You can't broadcast. You don't have a license. I would beg to differ, sir. I would beg to differ. That is looking at one aspect of the First Amendment, the right to broadcast. And let's assume, let's assume for my purposes of argument for the rest of this discussion that there is no First Amendment interest in broadcasting, no First Amendment interest in the right to broadcast. Let's just put that out of the ballpark. There is still the right of listeners. There is still the interest of the public in hearing what is said. But most importantly and paramount is that we're talking about instrumentalities of expression. And when we're talking about instrumentalities of expression, the Supreme Court in a number of cases has said you have to impose rigorous procedural safeguards because of the risk of erroneous deprivation, not the ultimate erroneous deprivation. Have they ever said that in the broadcasting context? Because the problem with the broadcasting context is that if you can't broadcast, there's nothing for the listener to hear. It really doesn't matter anymore. There's just nothing there. In books, in print, because of the ability to duplicate the multiplicity of outlets, I think the factors come out being a little bit different. So have we ever had a statement like that in a broadcast context? The Court has addressed it or the courts have addressed specifically instrumentalities in the context of books, film, news racks, audio sound equipment in the SAIA case, S-A-I-A. And they have said that those are instrumentalities of expression. Those have the – and the reason that they're saying that is because they have the capability to disseminate information. They have the ability to disseminate information. And when that happens, then there's a special analysis that has to be undertaken. And that's what – that's what we're saying. That's what we're saying. And it's not a – it's not a far leap. Actually, there's one additional case that talks about it somewhat. It talks about the First Amendment overlay in the Fourth Amendment context. And that was the case cited – in our Rule 28J letter, Voicenet, a recent case. It's a district court case, I believe, out of Pennsylvania. But Voicenet talked about the government going in and seizing an ISP's computer because they thought that there was something illicit on it. And these cases mainly about pornography where there's a question and a judgment to be made about whether it's obscene or not, as opposed to this where it's just a binary determination, is it a licensed broadcast or not. So that's why there's additional protective steps that the courts have required. Not SAIA. Not the – not the case that dealt with sound amplification equipment. That didn't have to do with anything about obscenity or about – and I would agree. I mean, at the far end of the scale, the child pornography cases, those are a different ilk. That's a different matter. And that's not at issue here very clearly. But it's actually the obscenity cases where you most often find courts taking care at the – at the pre-seizure stage because you're removing it from the public eye. That's – it turned out that the obscenity cases are the ones that are most frequently encountered. Right. And the principle there, or the key right there, is that you're taking it away. You're taking it away from the public. It's not that you didn't do that. It did. You physically do it, but you don't have a license. And so as a result, you're not supposed to be broadcasting anyway. It's, again, who decides that? Who decides that we're not supposed to be broadcasting anyway? Well, the statute. It does. Ultimately, the statute does. And ultimately, a court does. But my point – I'm sorry. It's a case – this is a very – it's unique. You don't have a license. You can't broadcast. And the worst thing you might be asserting is that the timing is such that maybe you could have broadcast a few days longer if you'd had notice. That's all. It's possible. But, again, that's going to the end analysis. And I admit, that's the difficult part about the case. It's the point of the case that we talked about most amongst co-counsel. Well, I would assume you would. We sure did. And we saw that there is clearly no answer that's going to have you all sit back and say, ah, okay, we're going in your direction. I think you ought to be lobbying Congress to change the statute. We are doing that. We are doing that. And the folks from SFLR have been doing that for the 10 years. And that's exactly, as Judge Okuda referred to, why they are barred from ever again, ever more broadcasting low-power FM to the community in San Francisco. That's absurd. And another key is, another key is, when you look at the government's interest, I keep going back to Matthews, but it is a linchpin. The government's interest in pre-seizure, in pre-seizure without notice, in seizure without notice. That interest, that interest of protecting the public if they think that that's the way to do it, that can be done several different ways. That can be done through a cease and desist order. That can be done through an injunction. But if they went by the way of injunction, we would get to raise that argument. We would get to raise our constitutional arguments that that restriction on SFLR is improper and unconstitutional. And it is unique. You can raise the arguments now. We can't, actually. Procedurally, we can't. We would concede that. But that is something that they could do. And that's something that we say that they should have done. They should have given us our day in court from the gate, from the start. They didn't. And that's a procedural move. But we're saying that in a due process context, with the other options, with the interest there, with the risk of erroneous deprivation centering on these instrumentalities, that's what the Constitution requires them to do. If your time is at zero, I neglected to announce beforehand, as I usually do to appellant counsel, that the time clock shows total time. So if you wish to reserve time for rebuttal, say so, because I didn't tell you that. We will give you a minute for rebuttal afterwards. I'll sit down now, and I appreciate that. Even if you say so, the time will still show your total time. So it behooves you to sit down when there's time left on the clock. But I didn't warn you, so we'll give it to you anyway. Thank you. May it please the Court. Eric Fagan for the United States. As the Sixth Circuit correctly held, there is no entitlement under the Due Process Clause to notice in a hearing prior to the seizure of radio equipment. Mr. Vermullin has made, you know, a very long case for why the First Amendment sort of adds some sort of weight onto the Matthews scale. But I think, as the Court's questions have gotten at, that's simply not the case, because when you're talking about radio, there is no First Amendment right to broadcast radio without a license. The Supreme Court in Red Lion was very clear that the inquiry into First Amendment rights depends heavily on the medium that's under discussion. And in the First Amendment, the Supreme Court in Red Lion and follow-up cases has consistently repeated that there is no First Amendment right to broadcast radio without a license. So there's no First Amendment interest in the seizure of radio equipment that's being used to broadcast radio without a license. The cases that the claimants cite almost exclusively deal with the obscenity context, which, again, as I think the Court was getting at during Appellant's argument, is a much, much more complicated inquiry. And under the Miller test, there's a nine-part inquiry and there's some jury findings involved. And in that type of case, you want to – you don't want the executive branch making the up-front determination. But the presumption is flipped in the context of radio, where presumptively you need a license before the First Amendment interest attached, as the Supreme Court's made clear. The government seizing SFLR's radio equipment in this case complied with all the relevant statutes and all the relevant procedures. It's completely uncontested that they actually were using the radio equipment to broadcast the pirate radio station, and therefore, we think this Court should affirm the judgment of the district court. I take it you understand that the seizure element itself is beyond the FCC's decision. Ultimately, the FCC doesn't get to adjudicate whether or not a seizure is proper. That's something that goes to the Court. Is that part correct? Insofar as the Court would have to decide whether the seizure comported with due process, that's absolutely correct. And in fact, I mean, the statute provides for seizure of the equipment for unlicensed broadcasting, and it's the FCC that decides whether or not a license will be issued. That's technically a factual determination by the Court. But as Judge Akuta described it, it's binary. It's on-off. And it's real easy to say, is it on or is it off? There's no license. That's a factual finding that's real simple. But whether, for example, a given piece of equipment comes within the circle of what you're allowed to seize or whether it's really not used as part of the broadcasting and happened to be there for something else, there are decisions that ultimately are made by the Court in this field, which brings us to the due process issue. Why is it that the government felt the need to move forward and exercise its rights for seizing before the Court makes a determination, A, as to whether any seizure is proper, and that, as I say, I think is a pretty easy decision, and, B, which equipment might be susceptible or vulnerable to seizure under the statute? There are decisions the Court has to make. Why seize before the Court makes those decisions? Well, as to why the government needs to go in before a Court determines before some sort of adversary hearing the seizure is proper is because, you know, as in the Calero-Toledo case that's cited in our briefs, the government has a strong interest in making sure that the equipment doesn't move anywhere. As the record in this case demonstrates, the equipment, they actually were broadcasting out of a camper van for some period of time, which demonstrates how highly mobile the equipment was, as was the case in the Supreme Court's Calero-Toledo case. And the Court has held that in cases where equipment could easily be moved, there's no need for notice and hearing prior to the seizure. And then, you know, as far as the execution of the warrant prior to having the notice and the hearing, I mean, warrants are executed all the time without notice and hearing. And as the record in this case demonstrates, there's affidavits from the FCC officials that participated in the seizure with the U.S. Marshals. They are very careful to seize only the equipment they believe is actually forfeitable under the statute, which is the equipment that's being used for the commission of an unlawful radio broadcast. So actually, as the record demonstrates in this case, there were CDs they didn't seize, there was a computer they didn't seize, all because they didn't think that that was the equipment they needed to seize in order to stop this particular radio broadcast. You know, as far as whether or not some sort of pre-seizure hearing was required, you know, we think this case is basically on all fours with Calera Toledo that such a hearing was not required, and it's certainly on all fours with the Sixth Circuit case determining that such a hearing was not required. There was a – was there a warrant obtained in this case? There was – there was the warrant that was issued – there was the arrest warrant for the property, and then there was a writ of entry that allowed the government to actually go into the home and seize the equipment. And that was – and you can see on the excerpts of record at page 23, that was signed by Judge Walker, who had in front of him the government's complaints and also the affidavit of David Dune, the FCC agent. So as to that element, you did actually have judicial supervision and approval, but it came pre-notice and without – it was ex parte, without an opportunity for the other side, but you had judicial review. That's correct, Your Honor. And again, the reason we need to do this ex parte is to prevent the movement of the equipment, especially, you know, if the equipment were to be moved outside the jurisdiction. You went before two different judicial officers. Why was that? I'm not quite clear what the – do you mean the clerk of court versus the judge? Well, under the supplemental admiralty rules that were in effect at the time, it was the clerk of court who was required to issue the arrest warrant for the property. And in order to get a writ of entry, the statute, which is – I think it's 18 U.S.C. 983J1, empowers the court itself and presumably to those who need a judge to issue other orders that are supplementary to whatever seizure needs to take place. So in that case, I believe it's the government's practice to go before a district judge, submit all the materials that we have, and get the district judge to sign a writ of entry. So the reason why – I mean, that's a long answer to your question. I mean, the reason why is we were simply trying to follow the rules in the statute that were applicable in this case. And again, there's no question that we failed to follow the rules in the statute that were applicable in this case. Although technically this equipment was movable, as a practical matter, was there really a concern about it being moved? I mean, this radio station had been operating in a sort of civil disobedience style. They had made no secret of it. They had been in contact with the FCC and with the authorities. Was there really a concern of – that the equipment would be moved away in the night? Well, Mr. June's affidavit does say that the FCC officials were concerned that the equipment needed to be seized immediately. As far as – I can't speak to exactly whether at the time the officials thought there was a risk that it was going to be moved imminently. But, you know, it's clear from the case law, it's the government's view, that had we given them notice and had they known we were coming, there is certainly a high likelihood that the equipment could have been moved or would have been moved. And the inquiry under Clara Toledo and under the Sixth Circuit's 9613 Madison Avenue case specifically speaks to whether the equipment could be moved, not that the government has to make some sort of showing that under the circumstances the equipment will be moved. And clearly this type of equipment could be moved. The record shows it had been moved at least once and that they had been broadcasting out of a camper van for some time. I mean, you could imagine them sort of driving around the streets of San Francisco as the FCC truck is chasing them, trying to triangulate them. It's like a bad movie somehow. Some sort of bad movie. And certainly, you know, it's not the government – the government doesn't believe that the Due Process Clause requires us to kind of play this kind of game of cat and mouse. And ever since Clara Toledo, that's plainly been the case. Unless the Court has any further questions. Thank you. Thank you. Three points, if I may. We need to be really clear about the procedure that was used. Supplemental Rule C-3A says that when the government files a complaint with the clerk of the court, the clerk of the court must promptly issue the warrant for arrest, separate and apart from what happens next, and that is the government takes that and goes to a judge for a writ of entry under a separate procedure, Rule 18 U.S.C. 983, completely separate. The court – the clerk is the one that says, you will arrest. And they say that because they must say that under the rules. That's what we're saying is wrong. Second point. Clara Toledo was decided in 1974. If Clara Toledo stands for any movable equipment – Clara Toledo does not stand for the principle that any movable equipment is just cause for the government to go and seize it. The Matthews case that came two years later and the Good case that came in 1993 that undertook the Matthews analysis says that's one thing to consider among the factors in the overall analysis under due process. Clara – Clara Toledo does not – is not the trump card here. It's one factor in the analysis. The risk of movement in this instance was really zero. Once in ten years did this equipment move. The equipment is easily locatable. The Keystone Cops scenario is entertaining but not realistic. These people wanted this fight. They wanted this fight. And they were above board about it. That stands for something. And that puts to rest any argument about movable property and how that might govern the procedure. Thank you. Thank you. We thank both counsel for the argument. Case just argued is submitted.
judges: B. Fletcher, Clifton, Ikuta